IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUAL EMPLOYMENT OPPORTUNITY : 
COMMISSION :
:
v. :
: Civil Action No. CCB-08-1882
XERXES CORPORATION :
:

...o0o...

**MEMORANDUM**

Now pending before the court is a motion for summary judgment, filed by defendant Xerxes Corporation ("Xerxes"), and a motion for partial summary judgment filed by the Equal Employment Opportunity Commission ("EEOC"). The EEOC brings this lawsuit on behalf of Keith Wilson, Albert Bernard Pearson, and Gradian Graham, asserting that Xerxes violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, by creating a hostile work environment for these employees because of their race. The issues in this case have been fully briefed and the court heard oral argument on November 5, 2009. For the reasons stated below, Xerxes' motion for summary judgment will be granted and the EEOC's motion for partial summary judgment will be denied.

**BACKGROUND**

The EEOC claims that Xerxes violated Title VII by creating a racially hostile work environment for three African-American employees: Keith Wilson, Albert Bernard Pearson, and Gradian "Roy" Graham. All of the plaintiffs were employed at Xerxes' plant in Williamsport, Maryland during the events at issue in this case. Mr. Wilson began working for Xerxes in October 2005 and currently remains employed there. Xerxes hired Mr. Pearson as a full-time employee in

June 2005, after he had served as a temporary worker since April 2005. Mr. Pearson resigned in February 2008. Mr. Graham began working for Xerxes in August 2004 and was terminated on April 18, 2007.

I.  Gradian "Roy" Graham

Mr. Graham alleges that coworker Robert Churchey routinely used the word "nigger" in his presence. Mr. Graham claims to have complained to Plant Superintendant Greg Carty, who never responded. In Mr. Graham's deposition, however, he was unable to recall precisely what Mr. Churchey said to him and when he might have said it. (*See* Def.'s Resp. 16 (citing Graham Dep. 98-99).)

Mr. Graham also alleges a pattern of intimidation that was not clearly racially motivated. Mr. Graham claims that a group of men followed him home at some point in 2005. In addition, Mr. Graham asserts that Shift Supervisor Robert Shifflett stared at him at work and watched him while he was inside of a bathroom stall. On January 19, 2007, Mr. Graham complained about the staring to Mr. Carty and explained that he believed it to be racially motivated. Mr. Carty and Plant Manager Wayne Green met with Mr. Graham on January 26, 2007 to discuss his allegations, and Mr. Green concluded that no racial harassment had taken place. On January 30, 2007, Mr. Graham told Mr. Carty that Mr. Shifflett had peered under a bathroom stall to watch him while he was inside. Mr. Graham identified coworker Tony Yung as a witness. Mr. Carty subsequently investigated the allegation and spoke with Mr. Yung, who contradicted Mr. Graham's account.[1] On February 1, 2007, Mr. Green, Mr. Carty, Mr. Graham, and union steward Mark Shaffer met to discuss the bathroom allegation. At the meeting, however, Mr. Graham changed his story and claimed instead

---

[1] The EEOC suggested at the hearing that Mr. Yung was unable to confirm Mr. Graham's allegations because of a language barrier. The EEOC has not presented any evidence in support of this contention.

that Mr. Shifflett had watched him through the cracks in the door of the bathroom stall. On March 8, 2007, Mr. Green concluded that Mr. Graham had filed a false report and disciplined him with a final warning in light of this event and prior complaints of disruptive behavior and insubordination. (*See* Pl.'s Cross Mot. Ex. 8.) Xerxes eventually terminated Mr. Graham on April 18, 2007, because of his poor attendance record. (*See* Pl.'s Cross Mot. Ex. 9.)

   II.   Albert Bernard Pearson

According to the EEOC, Mr. Pearson was subjected to racial slurs soon after joining Xerxes. Mr. Pearson claims that coworker Floyd Myers frequently called him a "black Pollack" and a "boy" while pantomiming cracking a whip at him. Mr. Pearson also alleges that coworker Amber Gatrell often used the word "nigger" in his presence. The EEOC asserts that Mr. Pearson complained to Mr. Shifflett about this conduct "[w]ithin weeks of becoming permanent with [Xerxes]." (Pl.'s Cross Mot. 6.) Yet in response to a question about when he lodged his first complaint, Mr. Pearson stated during his deposition: "I don't remember the timing or whatever, but I know it was a while after [being hired as a permanent employee]" and "I can't really remember the exact month or date or anything…" (Pl.'s Cross Mot. Ex. 1 Pearson Dep. 94.) After this initial complaint proved fruitless, Mr. Pearson went up the chain of command to Mr. Carty. According to Mr. Pearson, Mr. Carty claimed that Mr. Shifflett never passed along Mr. Pearson's complaints to him. Mr. Carty allegedly told Mr. Pearson to keep quiet about the harassment and that he would take care of it. Mr. Pearson asserts that the harassment intensified after Mr. Wilson began working at the Williamsport plant in October 2005, with Ms. Gatrell and Mr. Myers repeatedly referring to both Pearson and Wilson as "boy" and "nigger." Mr. Myers also allegedly called white coworker April Acree a "nigger-lover" in Mr. Pearson's presence.

3

Xerxes asserts that after Mr. Wilson complained to Mr. Shifflett about similar derogatory language in January or February of 2006, Mr. Shifflett met with Ms. Gatrell and she subsequently apologized to both Mr. Pearson and Mr. Wilson. The EEOC claims that Mr. Green learned of Mr. Pearson's complaints of harassment on February 2, 2006 and took no action.

Mr. Pearson also describes several pranks coworkers played against him, although he does not specify the dates on which these pranks occurred. On about three occasions, someone turned the bathroom lights off and threw wet toilet paper at Mr. Pearson while he was using the toilet. Mr. Pearson describes another instance where someone covered the bathroom doorknob with gel, so that he had difficulty opening the door to turn the lights on. Mr. Pearson also claims that someone hid his tool box on two different occasions, placed resin on his lock so that he could not open it on seven different occasions, and stole his diary logging these incidents from his locker another time. In addition, Mr. Pearson asserts that someone often threw away his lunch and stole buckets of resin and catalyst from his work station during breaks.

Mr. Pearson claims that in May 2006, he complained to Mr. Green about the use of the terms "jungle music" and "nigger music" by white coworkers Terry Smith and Brian Bradley. In June 2006, Mr. Pearson filed a complaint with the Maryland Commission on Human Relations. Soon after, Mr. Green contacted Xerxes' General Counsel Craig Peterson, who relayed the information to Ronald Bachmeier, Xerxes' Chief Financial Officer and EEO Coordinator at the time. In July 2006, Mr. Bachmeier flew to the Williamsport Plant to conduct an investigation.

Xerxes claims that Mr. Bachmeier initially tried to interview Mr. Pearson on July 5, but that Mr. Pearson refused to speak with him. Mr. Pearson did agree to speak with Mr. Bachmeier on July 6. Mr. Bachmeier also conducted interviews with about 15 other employees and various supervisors. He stated in his affidavit that the supervisors "credibly disputed Mr. Pearson's

contention that he spoke to them or Mr. Pearson's version of their communications." (Def.'s Summ. J. Mem. Ex. 3, Bachmeier Aff. ¶ 17.) Mr. Bachmeier also concluded that Mr. Myers and Ms. Gatrell had made racially derogatory remarks to Mr. Pearson and subsequently issued them written Notices of Disciplinary Suspension and Final Warnings. Both Mr. Myers and Ms. Gatrell were punished with two days of unpaid suspension. Mr. Bachmeier further found that although Mr. Bradley had referred to certain music as 'jungle music," he had not intended this as a derogatory remark. Because of Mr. Bradley's previously untarnished disciplinary record, Xerxes issued him a written Disciplinary Warning, required him to attend additional anti-harassment training, and did not issue him any suspension. Mr. Bachmeier also concluded that Tammy Smith had used the term "Buckwheat" while talking to a different African-American employee, but that she did not intend to use the term in a derogatory manner. Instead, Mr. Bachmeier found that she was simply referring to a television show character. Accordingly, Mr. Bachmeier provided Ms. Smith with verbal counseling and required that she undergo additional anti-harassment training. On July 25, 2006, Mr. Bachmeier conducted retraining sessions on the company's equal employment opportunity ("EEO") policy for both supervisors and employees. Mr. Green wrote Mr. Pearson a memorandum outlining the steps Xerxes had taken to investigate and remedy the harassment and thanked Mr. Pearson for coming forward with his complaints.

      The EEOC claims that these written warnings were ineffective because they explained to employees that they were being disciplined for sexual, rather than racial, harassment. (*See* Def.'s Resp. Exs. 3-4.) Indeed the first two paragraphs of the warning letters appear to have been copied from a standard letter relating to sexual harassment, as they specify the company's position against this type of harassment. (*See id.*) Xerxes points out, however, that despite these errors, the letter later specifies that the employee "shall not make any *racially* hostile, offensive, or intimidating

5

remarks, gestures, or engage in any conduct, of any type, which is *racially* offensive." (Def.'s Resp. 7 (citing Exs. 3-4).) Furthermore, Ms. Gatrell acknowledged in her deposition that she understood she had been disciplined for racial harassment. (Def.'s Resp. 8 (citing Ex. 1, Gatrell Dep. 130-31).)

After this incident, Mr. Green claims to have checked with Mr. Pearson periodically to ensure that he had no further complaints of harassment. Mr. Pearson instead alleges that Ms. Gatrell continued to harass him upon her return to work and that Mr. Carty knew of this and did nothing. On April 10, 2007, Mr. Pearson found a piece of fiberglass in his locker with the message, "KKK plans could result in death, serious personal injury, NIGGA BENARd" glued on it. (Pl.'s Cross Mot. 8. (describing Ex. 13).) Mr. Pearson claims that he immediately reported the threat to Mr. Green, who told him that he was busy and that he should return the following day. Xerxes, however, asserts that after Mr. Green learned of the fiberglass incident from plant management, he sought out Mr. Pearson to learn more about what had occurred. According to Mr. Green, Mr. Pearson refused to cooperate with his investigation and insisted on contacting his own attorney. Mr. Pearson eventually allowed Mr. Green to photograph the fiberglass piece.

Mr. Green enlisted the assistance of the Washington County Sheriff's Office on April 20, 2007. On April 25, Mr. Pearson filled out a Charge Information Questionnaire with the EEOC, although he did not mention the fiberglass incident in the questionnaire. (*See* Pl.'s Cross Mot. Ex. 10.) Deputy James Robert Grimm visited the Xerxes plant on April 26 to conduct an investigation and interviewed Mr. Pearson. The Sheriff's Office was ultimately unable to determine the source of the threatening fiberglass piece. Mr. Green claims to have continued the internal investigation of the incident by interviewing individual employees and holding an all-staff meeting, in which he led a retraining on the company's EEO policies. Mr. Pearson asserts that his coworkers blamed him for the retraining and continued to harass him. Mr. Green also posted a memorandum reminding

6

employees of Xerxes' anti-harassment policy. Mr. Green claims that when he checked in with Mr. Pearson on June 1, 2007, Mr. Pearson indicated his approval of the Sheriff's investigation. Mr. Green's file memorandum from that day, however, reveals that Mr. Pearson complained to him that someone had put resin on his lock. Mr. Green indicates in the memorandum that he offered to replace Mr. Pearson's lock.

Mr. Pearson's final claims of harassment arose in August 2007. Coworker Sam Crone referred to African-American women as "nappy-headed hos" in Mr. Pearson's presence. In addition, Mr. Pearson alleges that Tammy Smith told him he looked like the monkey Curious George as he was climbing a ladder. Mr. Pearson does not claim to have reported these incidents to anyone at Xerxes.

Despite Mr. Pearson's allegations of harassment, Xerxes points to several instances in which Mr. Pearson indicated that he was satisfied with his job. When Mr. Pearson recruited Mr. Wilson to work at the Williamsport Plant in October 2005, for example, he told Mr. Wilson that Xerxes was "a good place to work at." (Def.'s Summ. J. Mem. Ex. 1, Wilson Dep. 34.) According to Mr. Wilson, "everything [Mr. Pearson] had to say was good," and he "didn't say nothing negative about the job." (*Id.*) In addition, Mr. Pearson withdrew the charge of discrimination he had filed with the Maryland Commission on Human Relations after Mr. Bachmeier's visit to the plant in July 2006. Mr. Pearson, however, alleges that he was tricked into withdrawing his claim by Catherine Scaggs, a Commission employee. (*See* Pl.'s Cross Mot. Ex. 11.) Xerxes also points to the voicemail message that Mr. Pearson left for Mr. Green after he resigned in February 2008 as evidence of Mr. Pearson's job satisfaction. In the message, Mr. Pearson explains that he is leaving to work at a correctional facility, but would like to know if he could return to Xerxes if he does not like his new

job. (*See* Def.'s Summ. J. Mot. 3.) After accepting this job at the correctional facility, Mr. Pearson did not return to the Williamsport Plant.

   III.   Keith Wilson

Mr. Wilson's allegations of harassment began in October 2005, when just a few weeks after starting his new job, coworkers threw away his lunch on several occasions. He believed the harassment to be racially motivated because it only happened to Mr. Pearson and him, the only African-American employees on their shift. Mr. Wilson reported the problem to Mr. Shifflett, who did nothing according to Mr. Wilson. Mr. Wilson never reported the incidents further up the chain of command to Mr. Carty or Mr. Green.

In January or February of 2006, after Ms. Gatrell began calling Mr. Wilson "boy," Mr. Wilson again claims to have complained to Mr. Shifflett. Mr. Wilson asserts that Mr. Shifflett promised to take his complaints to Mr. Green, but that the harassment continued. In response, Mr. Shifflett met with Ms. Gatrell, who explained to him that she did not intend to use the word "boy" in a derogatory manner. Ms. Gatrell later apologized to both Mr. Wilson and Mr. Pearson. Mr. Wilson claims that Mr. Myers called him "boy" immediately after this incident, but that he apologized the following day. Mr. Wilson complained to Mr. Green about these remarks some time during this period as well. Later in February, Mr. Green held a meeting for everyone on Mr. Wilson's shift about Xerxes' prohibition on harassment. Mr. Wilson claims that the harassment grew worse after this meeting.

The EEOC asserts that, like Mr. Pearson, Mr. Wilson was offended by Mr. Bradley's references to "jungle" and "nigger" music. Mr. Wilson states in his deposition that Mr. Bradley referred to rap music as "some type of African music or something like that" and that he was "kind of offended, but I thought it was—like, I didn't really pay him too much attention…" (Pl.'s Cross

Mot. Ex. 1, Wilson Dep. 43.) According to Mr. Pearson's account, these remarks occurred around May 2006. Mr. Myers and Mr. Bradley were all eventually disciplined in July 2006, after Mr. Bachmeier's visit to the plant.

After Mr. Bachmeier's visit, all was quiet for Mr. Wilson until June 11, 2007, when he found a note in his locker with a stick figure drawing of a person hanging by a noose. Next to the drawing, the note contained the writing, "IH IH MY NIGGER." (Pl.'s Cross Motion Ex. 14.) Mr. Wilson reported the note to Mr. Shifflett, who copied it and informed Mr. Green about it. Mr. Green then held a meeting with Mr. Wilson. Mr. Wilson contacted the EEOC around this time period and told the EEOC attorney that Xerxes' only response to the incident had been from Mr. Green, who simply instructed him to let him know if anything else happened.

At some point, Mike Zais, Xerxes' new EEO Coordinator, learned of this incident and flew to the plant in August 2007 to investigate. Mr. Zais spent three days in Hagerstown and interviewed eight employees. In Mr. Zais's August 30, 2007 letter to Mr. Wilson, he explained the remedial steps he had taken, including: contacting the Sherriff's Office about the drawing, conducting a retraining for all supervisors, taking strong disciplinary action against three employees who had made harassing statements, advising the union representative of Xerxes' policy against harassment, and speaking with individual employees about their language. (*See* Def.'s Summ. J. Mem. Ex. 3, Green Aff. Ex. G.)

Mr. Wilson claims that after lodging his harassment complaints, Mr. Shifflett began to watch him more closely during his breaks. Mr. Wilson believed that Mr. Shifflett was waiting for him to make a mistake so he could be fired. On August 25, 2008, Ms. Smith allegedly told Mr. Wilson that she was "not trying to be nobody's nigger" because she was upset about having to clean up her work area. (Pl.'s Cross Mot. Ex 1, Wilson Dep. 128, 156.) Mr. Wilson claims to have

9

reported the incident to Mr. Shifflett. However, Xerxes asserts that its management first learned of Ms. Smith's remarks from the EEOC on September 17, 2008. On October 31, 2008, Mr. Green wrote Mr. Wilson a memorandum outlining the steps he had taken to investigate the derogatory comments that Ms. Smith had allegedly made. (*See* Def.'s Summ. J. Mem. Ex. 3, Green Aff. Ex. H.) Mr. Green concluded the memorandum by stating that Mr. Wilson's claim could not be substantiated. (*See id.*) He also reminded Mr. Wilson of the importance of promptly reporting any allegations of harassment. (*See id.*)

***

Xerxes has moved for summary judgment on two grounds. First, Xerxes argues that liability may not be imputed to it based on coworker harassment because it acted promptly and effectively to eliminate the harassment once it learned of the allegations. Second, Xerxes claims that the harassment experienced by the plaintiffs was insufficiently severe and pervasive to substantiate a hostile work environment claim under Title VII.  The EEOC has filed a cross motion for partial summary judgment, arguing that Xerxes' affirmative defense regarding its response to charges of harassment fails as a matter of law. The EEOC also opposes Xerxes' motion for summary judgment.

## **ANALYSIS**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotations omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

To succeed on a claim for a racially hostile work environment, the employee must show that the harassment was: 1) unwelcome, 2) based on race, 3) sufficiently severe or pervasive to alter the conditions of employment, and 4) there was some basis for imposing liability on the employer. *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183-84 (4th Cir. 2001). Although the first element is subjective, the other elements are objective, based on a "reasonable person" standard. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). In determining whether conduct is sufficiently severe and pervasive, the courts look to the "totality of the circumstances," including 1) the frequency of the discriminatory conduct, 2) the severity of the conduct, 3) whether the conduct was physically

threatening, humiliating, or a mere offensive utterance, and 4) whether it unreasonably interferes with an employee's work performance. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998).

The court will assume without deciding that the EEOC has satisfied the first three elements of its hostile work environment claim.[2] For the purposes of determining employer liability, workplace harassment by coworkers is treated differently from harassment by supervisors with authority over the employee. *See Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006). When a supervisor harasses an employee, the employer is vicariously liable for the harassment, but may assert limited affirmative defenses. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). If a coworker is responsible for the harassment, however, a negligence standard applies such that the employer will only be liable if "it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc).

An employer cannot avoid liability under Title VII by willfully ignoring harassment. *See id.* at 334. Therefore, an employer will be charged with "constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." *Id.* Once the employer is aware of the harassment, it must "respond with remedial action 'reasonably calculated to end the harassment.'" *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) (quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131-32 (4th Cir. 1995)). As proving employer liability is part of the plaintiff's prima facie case, the plaintiff has the burden of demonstrating that the defendant failed to reasonably respond. *See EEOC v. Central*

---

[2] If it becomes necessary at some future point to decide whether the harassment was severe and pervasive, the court doubts that the sporadic instances of harassment experienced by Mr. Graham would meet this threshold.

*Wholesalers, Inc.*, 573 F.3d 167, 177 (4th Cir. 2009) (noting that "the EEOC must establish a basis for imposing liability on" the defendant employer in a case involving coworker harassment) (internal quotations omitted).

The harassment in this case was committed by coworkers, and thus the EEOC must prove that Xerxes was aware of the harassment, but negligently failed to take effective action to stop it.[3] The record, however, reveals that whenever Xerxes learned of harassment, it acted quickly and reasonably effectively to end it. Instances where Xerxes was unaware of the harassment were not caused by willful ignorance, but by the complainants' failure to notify Xerxes' management. In these cases, as soon as Xerxes' management learned of the harassment, it acted immediately to investigate and attempt to prevent the harassment from happening again in the future.

Soon after Mr. Wilson complained to Mr. Shifflett about Ms. Gatrell's racist comments in January or February of 2006, Mr. Shifflett met with Ms. Gatrell, who subsequently apologized to both Mr. Wilson and Mr. Pearson. In addition, although Mr. Myers called Mr. Wilson "boy" shortly after Ms. Gatrell's apology, Mr. Wilson reported this comment to Mr. Shifflett and Mr. Myers apologized to Mr. Wilson the following day. Once Mr. Green learned of these complaints in February 2006, he held a meeting for everyone on Mr. Pearson and Mr. Wilson's shift, explaining Xerxes' position on harassment and warning employees that they would be disciplined for racially harassing others. Mr. Wilson claims that the harassment grew worse after this meeting, but he does not appear to have reported any further incidents of harassment to his supervisors. Given the plant

---

[3] Mr. Graham alleges that Mr. Shifflett, a supervisor, harassed him by staring at him and following him to the bathroom. As this alleged harassment does not appear to have been racially-motivated, however, it falls outside the purview of Title VII and cannot form the basis for employer liability in this case.

supervisors' prompt response to these allegations of harassment,[4] it is reasonable that upon hearing no further complaints of harassment, Mr. Green concluded that the harassment had ended. In addition, the fact that Xerxes had a written policy prohibiting racial and sexual harassment and outlining a reporting procedure, indicates that Xerxes did not ignore racial harassment at the plant after February 2006. (*See* Def.'s Summ. J. Mem. Ex. 3, Bachmeier Aff. Ex. A.)

The EEOC alleges that Mr. Pearson complained to Mr. Green about Mr. Smith and Mr. Bradley's use of the terms "jungle music" and "nigger music" in May 2006. The exhibit that the EEOC cites to support this allegation, however, does not contain any date and neither does Mr. Pearson's deposition. (*See* Pl.'s Cross Mot. Ex. 1, Pearson Dep., Ex. 11.) Mr. Pearson mentioned in his deposition that he told Mr. Bachmeier about these incidents during his trip to the plant in July 2006. (*See* Pl.'s Cross Mot. Ex. 1, Pearson Dep. at 315.) This was after Mr. Bachmeier flew to the plant to investigate charges of racial harassment upon learning of Mr. Pearson's complaint filed with the Maryland Commission on Human Relations.

Mr. Bachmeier effectively responded to these allegations of harassment by interviewing numerous employees, issuing Ms. Gatrell and Mr. Myers written notices of Disciplinary Suspension and Final Warning, accompanied by two days of unpaid suspension, issuing Mr. Bradley a writing Disciplinary Warning, providing Ms. Smith with verbal counseling, and conducting EEO retraining sessions for all employees and supervisors at the plant. Despite the accidental references to "sexual" rather than "racial" harassment in certain parts of the disciplinary letters, it is clear that the employees who received these letters knew they were being disciplined for racial, not sexual,

---

[4] Although the EEOC alleges that Mr. Pearson complained to Mr. Shifflett about racial harassment by Ms. Gatrell and Mr. Myers as early as the summer of 2005, Mr. Pearson was unable to provide any estimate as to the month in which this occurred in his deposition. Accordingly, the court will not consider this factually unsupported allegation in determining the promptness of Xerxes' response to complaints of harassment.

harassment. In contrast to the prompt remedial measures taken by Mr. Bachmeier upon learning of the harassment at the plant, Mr. Pearson initially refused to talk to Mr. Bachmeier when he arrived at the plant to conduct the investigation. Mr. Bachmeier persisted, however, and convinced Mr. Pearson to talk to him the following day. Finally, Mr. Bachmeier wrote Mr. Pearson a letter outlining all the ameliorative steps he had taken and thanking him for coming forward with his complaints.

Xerxes' pattern of earnestly responding to allegations of harassment continued as the harassment grew more severe. When Mr. Pearson found the threatening fiberglass piece in his locker on April 10, 2007, Mr. Green responded by notifying the Sherriff's Office ten days later. Although the EEOC argues that ten days was too long a delay, Mr. Green apparently had trouble gathering information from Mr. Pearson, who initially refused to speak with him about the fiberglass. In addition, Mr. Pearson never attempted to enlist the help of the Sherriff's Office himself. Mr. Pearson's only response to the incident was filing a charge of harassment with the EEOC on April 25. In addition to allowing the Sherriff's Office access to the plant to conduct its investigation, Mr. Green initiated his own investigation by interviewing employees and holding an all-staff meeting where he asked employees to come forward with information. At the meeting, Mr. Green also retrained employees on the company's EEO policy and followed up by posting the policy around the plant. Mr. Green subsequently checked in with Mr. Pearson to keep apprised of any new instances of harassment. When he learned on June 1, 2007 about someone putting resin on Mr. Pearson's lock, he offered to replace the lock. These proactive steps to address and learn of new incidents of harassment indicate Xerxes' commitment to stopping racial harassment at the plant.

In response to the stick figure drawing that Mr. Wilson found in his locker in June 2007, Mr. Green met with Mr. Wilson and later notified Mr. Zais, Xerxes' new EEO Coordinator. Mr. Zais

flew to the plant in August where he interviewed employees, enlisted the help of the Sherriff's Office, retrained all supervisors on their responsibility to stop harassment, disciplined three employees who had made racist statements, advised the union representative that Xerxes would take strong disciplinary action in response to racial harassment, spoke with individual employees about their language, and posted notices about Xerxes' prohibition on harassment. Mr. Zais then wrote Mr. Wilson a letter outlining all these steps and thanking him for coming forward with his complaints. Given Xerxes' collective bargaining agreement with the employees' union, it is difficult to imagine what further steps Xerxes might have taken to discipline employees or to prevent future instances of harassment. (*See* Def.'s Summ. J. Mem. 4.) Indeed, when asked in an interrogatory what more Xerxes could have done to stop the harassment, the EEOC did not provide a single suggestion. (*See* Def.'s Resp. Ex. 5 at 6.)

      Xerxes' practice of conducting internal investigations and notifying law enforcement in cases of especially severe and threatening harassment hardly portrays a company trying to ignore racial harassment. Although Xerxes claims not to have learned of Ms. Smith's alleged derogatory remarks on August 25, 2008, until they were mentioned by the EEOC on September 17, 2008, once Xerxes was notified, it acted promptly to investigate the allegation. These ameliorative steps were outlined in a memorandum that Mr. Green wrote to Mr. Wilson on October 21, 2008. In addition, while Mr. Pearson alleges that Mr. Crone and Ms. Smith used racist language in his presence in August 2007, he does not claim ever to have reported these incidents to any supervisors at Xerxes. Xerxes cannot be charged with constructively knowing of this harassment, given that it had reasonable reporting procedures in place and had previously thanked Mr. Pearson for coming forward with complaints of harassment and encouraged him to report any further incidents.

When Xerxes learned of racial harassment at the Williamsport Plant, it disciplined employees with unpaid suspensions and written reprimands. These actions set Xerxes apart from employers found to have responded inappropriately to employees' allegations of harassment. *See e.g., Central Wholesalers*, 573 F.3d at 178 (noting that the employer could have acted more responsively to complaints of harassment if it had "suspended [the offending employees] from work…or issued them written reprimands"); *Sunbelt*, 521 F.3d at 320 (discussing how despite the employer's attempt to investigate harassment, its failure to sanction or reprimand harassing employees was evidence of an inadequate response). Therefore, the EEOC has not met its burden of demonstrating that Xerxes acted negligently in responding to allegations of coworker harassment.[5] Accordingly, the EEOC's claims against Xerxes must fail.

### CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment will be granted and the EEOC's cross motion for partial summary judgment will be denied. A separate Order follows.

November 30, 2009                                                      /s/
Date                                                                          Catherine C. Blake
                                                                                  United States District Judge

---

[5] Despite the lack of employer liability in this case, the harassment alleged by Mr. Pearson and Mr. Wilson was severe and the EEOC's investigation into the harassment was certainly appropriate. When an employer attempts to address harassment with a sufficiently serious response, however, it is important for the court to recognize such conduct.